UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

STEVEN M. CLARKE,

                                              Plaintiff,

                    -against-

STATEWIDE AUTO REPAIR, INC.
and WILLIAM STEGMAN,

                                              Defendants.
----------------------------------------------------------------------X

<u>For Online Publication Only</u>

<u>**ORDER**</u>
22-CV-07942 (JMA) (LGD)

**FILED**
**CLERK**

12:48 pm, May 29, 2025

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

On March 17, 2025, this Court granted in part and denied in part Plaintiff Steven Clarke's motion for default judgment and other relief pursuant to Fed. R. Civ. P. 55(b) against Defendants Statewide Auto Repair, Inc. and William Stegman. (<u>See</u> ECF No. 28.) Plaintiff alleged that Defendants violated his civil rights by committing racially discriminatory acts against him while providing roadside assistance to his car on the night of August 13, 2021. (<u>See</u> ECF No. 25.) The Court held that the allegations in Plaintiff's complaint established that Defendants Statewide Auto Repair, Inc. and William Stegman are liable under 42 U.S.C. § 1981, New York State Executive Law § 296, New York State Civil Rights Law § 40, negligence, negligent supervision/failure to supervise, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. (<u>See</u> ECF No. 28 at 2.)

On April 14, 2025, the Court held a damages hearing to determine the amount of damages to be awarded to Plaintiff for his claims. (<u>See</u> ECF No. 29, Minute Entry for Damages Inquest.) For the following reasons, Plaintiff is awarded $17,600 for lost overtime wages, $75,000 in compensatory damages for emotional distress, and $20,000 in punitive damages.

## I.    FINDINGS OF FACT

Plaintiff is an African American man and a New York State resident.  (Compl., ECF No. 1 ¶ 9.)  Plaintiff is a Lieutenant in the New York City Fire Department, where has worked for 18 years.  (Damages Inquest Transcript ("Tr."), ECF No. 30, at 3.)  Defendant Statewide is a New York roadside assistance service provider for AAA with a principal place of business in Uniondale, New York.  (Compl. ¶¶ 2-3.)  Statewide offers roadside service, including towing, as an authorized agent of AAA.  (Id. ¶ 3.)  Defendant Stegman is a white male employed by Statewide who was operating for Statewide on August 13, 2021.  (Id.)

On August 13, 2021, at or around 1:00 a.m., Plaintiff and his friend John Simmons were in Mr. Simmons' car on their way to Queens, New York from Garden City.  (Id. ¶ 16.)  While on route, Mr. Simmons' car began having what appeared to be engine problems.  (Tr. at 5.)  Mr. Simmons pulled over in Hempstead, New York and called AAA for roadside assistance.  (Id. at 5, 7.)  Mr. Simmons was put in contact with Statewide and was informed by a representative that a tow truck would be dispatched to his location to provide assistance.  (Id.; Compl. ¶ 17.)

At around 2:15 a.m., the tow truck arrived to the location where Plaintiff and Mr. Simmons were with the inoperative car.  (Compl. ¶ 19; Tr. at 5-6.)  The tow truck was being operated by Defendant Stegman, who looked very agitated and informed Plaintiff and Mr. Simmons that he was "not a cab driver."  (Tr. at 6.)  Mr. Simmons began to speak with Defendant Stegman, and Plaintiff walked to a nearby store to get a bottle of water.  (Id. at 6.)  While Plaintiff was at the nearby store, he received a call from Mr. Simmons, who informed him that he needed to rush back to the car because Defendant Stegman was going to leave him behind.  (Id. at 7.)  Upon Defendant Stegman hooking up the car and preparing it to be towed, Mr. Simmons got into the passenger compartment of the tow truck and Plaintiff sat in the cab of the truck next to Mr. Simmons.  (Id.)  While in the truck, Defendant Stegman stated, "I'm not a f**king cab driver."  (Id.)  Mr. Simmons

2

then told Defendant Stegman that he didn't want to leave Plaintiff behind because he wasn't sure exactly where they were at that time.  (Id. at 8.)  At that point, Defendant Stegman allegedly became irate and pulled out a gun and pointed it at Plaintiff's face.  (Id.)  As he pulled the gun out, Defendant Stegman allegedly said "I'm tired of you n**gers."  (Id. at 9.)

Plaintiff alleges that he froze at this point, and Mr. Simmons asked Defendant Stegman what he was doing and threw his body on Stegman's arm to push the gun away.  (Id.)  Mr. Simmons then told Defendant Stegman that Plaintiff was a lieutenant in the New York City Fire Department and that Mr. Simmons was a supervisor for the MTA.  (Id.)  Plaintiff alleges that he and Mr. Simmons were being violently targeted because they were Black.  (Id.)  Mr. Simmons began pleading with Defendant Stegman to bring them home, and Plaintiff was frozen in shock.  (Id. at 10.)

After this incident, Defendant Stegman continued to drive the truck and Plaintiff was eventually driven to a location near his home and dropped off.  (Id.)  When Plaintiff got home, he called the police to report the incident, and Defendant Stegman was later arrested and charged with the crime of Menacing in the Second Degree, a class A Misdemeanor, on September 17, 2021.  (Id. at 10-11; Compl. ¶ 30.)  Defendant Stegman ultimately pled guilty to a charge of disorderly conduct on April 14, 2022 in the Nassau County First District Court in Hempstead, New York.  (Compl. ¶ 30.)

After this incident, Plaintiff sought therapy through the FDNY's counseling program because he was anxious and thinking about how he could have been killed that day.  (Id. at 12-13.)  Plaintiff testified that he feels that he constantly has to "look over [his] shoulder" and is not comfortable when he is not in his fire department uniform because he fears being targeted in this manner again.  (Id. at 15-16.)  Plaintiff testified that this affected his social life, as he does not go out as often and wants to avoid being put into a similar situation again.  (Id. at 27.)

At the time this incident occurred in August 2021, Plaintiff had been assigned to work in the Rockaways for 2 months to assist due to a lack of firefighters there. (Id. at 16.) When working in the Rockaways, Plaintiff would be able to earn overtime wages because it was a special assignment that required firefighters to assist and stay in the area while working there. (Id. at 17.) However, as a result of the incident, Plaintiff was in such distress that he needed to attend counseling, causing him to miss out on this assignment. (Id. at 16-17.) Plaintiff testified that he missed out on 55 hours a week of overtime pay, for 8 weeks, for a total of 440 hours. (Id. at 19.) Since overtime wages amount to $80 an hour, Plaintiff testified that he lost a total of approximately $35,200 in overtime wages for the two-month period that he would have been working in the Rockaways.[1] (Id. at 19.)

Around a week after the incident, on August 20, 2021, Plaintiff began receiving counseling services through the FDNY. (Id. at 20-21) Starting in April of 2022, Plaintiff began receiving counseling from Shirley Lorquet, a licensed mental health counselor and Employee Assistance Program ("EAP") Specialist for the FDNY. (Compl. ¶ 18.; see also Ex. 2.) According to a letter from counselor Lorquet, Plaintiff "carries a clinical diagnosis of PTSD which originated from the tow truck incident he endured in 08/2021." (Ex. 2.) Plaintiff reportedly becomes easily triggered as it pertains to discussing the subject matter or anything that relates to the incident. (Id.) Furthermore, counselor Lorquet's letter notes that this incident has impacted Plaintiff's quality of sleep and his social functioning, as he tends to isolate himself whenever he experiences intrusive thoughts regarding the matter. (Id.) Plaintiff continues to exhibit symptoms of PTSD, but he implements coping mechanisms in order to get through these daily stressors and is making an effort

---

[1] The Court inquired as to whether there was any documentation regarding the lost overtime wages for the Rockaways assignment, and Plaintiff's counsel noted that it was hard to document what Plaintiff had not received, but that he did not know and would look into it. (Tr. at 37-38.)

to work through them.  (Id.)  Plaintiff will continue counseling services with the FDNY until he makes significant progress such that he no longer exhibits these symptoms.  (Id.)

According to Plaintiff, he continues to be triggered by things he sees at work and on the news, and thinking about the incident causes him to be filled with anxiety and panic.  (Tr. at 32.) He noted that counselor Lorquet taught him how to use coping mechanisms to redirect his thoughts and avoid the negative, intrusive thoughts associated with the incident.  (Id. at 33; Ex. 4.)

Plaintiff's medical records reflect counseling treatment through November 2023, and Plaintiff testified that he has continued his treatment after November 2023 and is still attending counseling sessions.  (Ex. 3; Tr. at 22.)  Plaintiff's counseling notes in August 2021 indicate that he had experienced trouble sleeping, difficulties in his social life, and flashbacks.  (Ex. 3 at 26.) Notably, Plaintiff's medical records also demonstrate improvement in his mental health and functioning.  For example, as early as October 1, 2021, Plaintiff's counseling notes indicate that Plaintiff was "[e]xpressing acceptance over this, noting positive feelings around driver being held accountable for his actions, though stating that the experience hasn't felt as heavy or present in his daily life with passing time."  (Ex. 3 at 23.)  Later, Plaintiff's January 30, 2023 counseling notes indicate that Plaintiff had been promoted to Lieutenant in the FDNY.  (Ex. 3 at 9.)  On November 27, 2023, Plaintiff's counseling notes indicate that Plaintiff was "adjusting well to his new firehouse" and "is functional as it pertains to his social and occupational functioning." (Ex. 3 at 7.)

## II.    DISCUSSION

### A.    Damages

"[W]hile a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."  Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC, 779 F.3d 182, 189 (2d Cir. 2015) (quoting Cement & Concrete Workers Dist. Council Welfare Fund v. Metro

Found. Contractors, Inc., 699 F.3d 230, 234 (2d Cir. 2012)).  The Court must conduct an inquiry to "ascertain the amount of damages with reasonable certainty."  Credit Lyonnais Sec., Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (citing Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)).  A court may make this determination based upon evidence presented at a hearing or upon a review of "detailed affidavits or documentary evidence."  Antoine v. Brooklyn Maids 26, Inc., 489 F. Supp. 3d 68, 90–91 (E.D.N.Y. 2020); see also Fed. R. Civ. P. 55(b)(2); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991).  In addition, where the damages are "not susceptible to simple mathematical calculation, Federal Rule of Civil Procedure 55(b)(2) gives courts discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence."  Am. Jewish Comm. v. Berman, No. 15-CV-5983, 2016 WL 3365313, at *4 (S.D.N.Y. June 15, 2016) (internal citation omitted).

### 1. Compensatory Damages

Plaintiff seeks compensatory damages for lost overtime wages in the amount of $35,200 and emotional pain and suffering in the amount of $385,000. (ECF No. 25 at 12; Tr. at 19.)  Having considered the relevant evidence, the Court awards damages in the amounts stated and for the reasons discussed below.

#### a) Lost Overtime Wages

With regards to the lost overtime wages, Plaintiff testified that at the time of the incident, he had been assigned to work in the Rockaways for 2 months to assist due to a lack of firefighters there.  (Tr. at 16.)  When working in the Rockaways, Plaintiff would be able to earn overtime wages because it was a special assignment that required firefighters to assist and stay in the area while working there.  (Id. at 17.)  However, as a result of the incident, Plaintiff was in such distress that he needed to attend counseling, causing him to miss out on this assignment.  (Id. at 16-17.)

Plaintiff testified that he missed out on 55 hours a week of overtime pay, for 8 weeks, for a total of 440 hours.  (Id. at 19.)  Since overtime wages amount to $80 an hour, Plaintiff testified that he lost a total of approximately $35,200 in overtime wages for the two-month period that he would have been working in the Rockaways. (Id. at 19.)

At the damages hearing, the Court inquired as to whether there was any documentation regarding the lost overtime wages for the Rockaways assignment, and Plaintiff's counsel noted that it was hard to document what Plaintiff had not received, but that he did not know and would look into it.  (Tr. at 37-38.)  The Court has not received any documentation supporting the amount of overtime wages that Plaintiff lost as a result of losing the Rockaways assignment.

Back pay serves to "make persons whole for injuries suffered through past discrimination." Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1183 (2d Cir. 1996) (citation omitted).  Unlike Title VII, which limits back pay awards to two years, "§ 1981 permits unlimited backpay."  Tomka v. Seiler Corp., 66 F.3d 1295, 1316 (2d Cir. 1995).  A plaintiff seeking back pay "need not prove the amount of loss with mathematical precision," but may recover back pay only to the extent that the evidence offers a "sufficient basis" for estimating an amount "with reasonable certainty."  Sir Speedy, Inc., v. L&P Graphics Inc., 957 F.2d 1033, 1038 (2d Cir. 1992).

Here, Plaintiff testified that he would have worked 55 hours a week in overtime hours for a period of 8 weeks during the Rockaways assignment.  (Tr. at 18.)  Since overtime wages were $80 an hour, Plaintiff testified that this would amount to a total amount of lost overtime wages of $35,200.  (Id. at 19.)  While the Court credits Plaintiff's testimony that he missed out on the Rockaways assignment as a result of missing work due to this incident, the Court will not award the requested amount of $35,200 where there is no documentary support for this calculation or guarantee that Plaintiff would have worked that amount of hours at that rate.  See Claud v. Brown Harris Stevens of Hamptons, LLC, 676 F. Supp. 3d 100, 134 (E.D.N.Y. 2023) (refusing to fully

7

credit projected commissions as lost wages where there was not documentary support for Plaintiff's calculated lost wages).

However, the Court will credit the Plaintiff's credible testimony that he missed out on a certain amount of overtime wages as a result of missing work and losing the Rockaways assignment. The Court will award $17,600 in lost overtime wages, which is a conservative estimate based on Plaintiff's testimony regarding the amount of hours he was projected to work a week, the hourly rate he would be paid in overtime wages, and the length of the Rockaways assignment. Since Plaintiff did not get the chance to begin the assignment, it cannot be said with certainty that he would have worked a total of 55 hours in overtime hours each week or that the full assignment would have lasted 2 months, as projected. However, the Court's calculation of $17,600 is a reasonable estimate that would apply if Plaintiff worked half of the projected overtime hours per week for 8 weeks or if the assignment only lasted one month as opposed to two. Therefore, Plaintiff is awarded $17,600 in lost overtime wages. While this is a conservative estimate of Plaintiff's lost overtime wages, the Court cannot award damages for further projected overtime wages without a sufficient evidentiary foundation.

b)    Emotional Distress Damages

Courts in the Second Circuit put compensatory damages for emotional distress into three categories—garden-variety, significant, or egregious:

> In garden-variety claims, the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury. These claims typically lack extraordinary circumstances and are not supported by medical testimony. Significant emotional distress claims are based on more substantial harm or offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses. Egregious emotional distress claims yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff.

Sooroojballie v. Port Auth. of New York & New Jersey, 816 F. App'x 536, 546 (2d Cir. 2020) (citations omitted). To assess whether an award for emotional distress is appropriate, courts consider the "amount, duration, and consequences of the claimant's emotional distress." Quintero v. Angels of the World, Inc., No. 19-CV-6126, 2021 WL 4464123, at *15 (E.D.N.Y. Sept. 10, 2021), report and recommendation adopted, 2021 WL 4463488 (E.D.N.Y. Sept. 29, 2021). This three-tiered approach has been used to calculate damages recoverable on a default judgment as well as by courts reviewing jury verdicts. Moore v. Houlihan's Rest., Inc., No. 07-CV-03129, 2011 WL 2470023, at *2 (E.D.N.Y. May 10, 2011), report and recommendation adopted, 2011 WL 2462194 (E.D.N.Y. June 17, 2011).

A claim for emotional distress is considered typical or "garden-variety" where "the plaintiff did not seek medical treatment but where the evidence . . . describes shock, nightmares, sleeplessness, humiliation, and other subjective distress." Santiago v. Crown Heights Ctr. for Nursing & Rehab., 2017 WL 9482107, at *23 (E.D.N.Y. Feb. 24, 2017) (recommending an award of $30,000 where plaintiff testified that he experienced "anxiety, stress, shame and embarrassment, and loss of self-worth"), report and recommendation adopted as modified, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017) (collecting cases).

"'Significant' emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012). Significant emotional distress damages usually range from $50,000.00 to $200,000.00. Emamian v. Rockefeller Univ., No. 7- CV-3919, 2018 WL 2849700, at *16 (S.D.N.Y. June 8, 2018).

Finally, in egregious cases, damages have been awarded in excess of $200,000. Awards of this magnitude "have only been warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected." Rainone, 388 F. Supp. 2d at 123 (citation omitted).

This record establishes that Plaintiff suffered more than "garden variety" emotional distress. However, courts have continued to reserve findings of "egregious" emotional distress damages for plaintiffs who have been subjected to permanent physical or mental changes in lifestyle—changes that Plaintiff, to his credit, appears to have worked through via ongoing treatment. See Sooroojballie, 816 F. App'x at 547–48 (collecting cases). Plaintiff's declaration and the corroborating notes from his treatment providers are sufficient to distinguish his claims from those courts have deemed "garden variety," but insufficient to establish that he suffered "egregious" emotional distress.

The record—which includes Plaintiff's testimony, a declaration from the Plaintiff, a medical note from a mental health counselor who treated Plaintiff, and Plaintiff's treatment notes—is sufficient to establish that Plaintiff is entitled to $75,000 in compensatory damages for emotional distress, pain, and suffering that he suffered as a result of the incident in this case.

## 2.    Punitive Damages

Punitive damages serve to punish a defendant for its conduct and deter both the defendant and others from similar future conduct. Claud, 676 F. Supp. 3d at 142 (citing Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)). Courts have awarded punitive damages under § 1981 when a defendant has engaged in "intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Hill v. Airborne Freight Corp., 212 F. Supp. 2d 59, 75 (E.D.N.Y. 2002), aff'd, 93 F. App'x 260 (2d Cir. 2004).

To ensure that a punitive damages award does not violate due process, a court looks to (1) "the degree of reprehensibility of the defendant's conduct," followed by (2) "the ratio [of punitive damages] to the actual harm inflicted on the plaintiff"; and (3) the comparison between the punitive damages award and the "civil or criminal penalties that could be imposed for comparable misconduct." BMW of N. Am. Inc. v. Gore, 517 U.S. 559, 575 (1996).

The Court finds that Defendants' conduct was reprehensible and that punitive damages are justified for purposes of deterrence. I therefore find that an award of $20,000 in punitive damages is appropriate here. Such an award corresponds to the degree of reprehensibility in Defendants' conduct, is not excessive at a ratio of compensatory damages to punitive damages of approximately 4.5 to 1, and may serve to deter future misconduct.

### 3.    Attorney's Fees

Plaintiff further requests $19,500 in attorney's fees. (See ECF No. 25 at 14.) In calculating attorneys' fees, "a district court should consider the rate [a] reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections, 522 F.3d 182, 193 (2d Cir. 2008). The presumptively reasonable fee, or the lodestar, is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." Millea v. Metro-N. R. Co., 658 F.3d 154, 166 (2d Cir. 2011). The party seeking to recover attorneys' fees bears the burden of establishing the reasonableness and necessity of hours spent and rates charged. See N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). "The absence of contemporaneous records precludes any fee award in all but the most extraordinary of circumstances." BH99 Realty, LLC v. Qian Wen Li, 2011 WL 1841530, at *7 (citing Scott v. City of N.Y., 626 F.3d 130, 133–34 (2d Cir. 2010)).

Here, Plaintiff did not provide *any* contemporaneous time records, or an accounting of hours expended in legal work and instead merely asserted the conclusory statement that Plaintiff is seeking "attorney's fees and costs in the amount of $19,500." (ECF No. 25 at 14.) Further, the evidence in the record does not suggest extraordinary circumstances. In short, Plaintiff's conclusory assertion regarding attorney's fees and costs is insufficient to calculate a presumptively reasonable fee. Therefore, Plaintiff's request for attorneys' fees is denied.

### III.    CONCLUSION

For the reasons stated above, the Court awards Plaintiff $112,600, consisting of: (1) $17,600 in lost wages; (2) $75,000 in compensatory damages; and (3) $20,000 in punitive damages. The defendants are jointly and severally liable for the $112,600 total award. The Court further orders Defendants to pay Plaintiff post-judgment interest calculated from the date judgment is entered in this action until the date of payment, using the federal rate set forth in 28 U.S.C. § 1961.

**SO ORDERED.**

Dated:    May 29, 2025
             Central Islip, New York

                          /s/    (JMA)
                          JOAN M. AZRACK
                          UNITED STATES DISTRICT JUDGE